## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| JOSEPH A. SOTTORIVA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  06-3118 |
| ) | |
| ROCCO J. CLAPS, Director of the ) | |
| Illinois Department of Human Rights, ) | |
| and DANIEL W. HINES, ) | |
| Comptroller of the State of Illinois, ) | |
| ) | |
| Defendants. ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter is before the Court on Defendants' Motion for Summary Judgment (d/e 42) and Plaintiff's Motion for Summary Judgment (d/e 44). Plaintiff Joseph Sottoriva, an employee of the Illinois Department of Human Rights (the Department), filed a three-count Complaint (d/e 1) against Rocco J. Claps, the Director of the Department, and Daniel W. Hynes, the Comptroller of the State of Illinois, after money was involuntarily withheld from his paychecks in an attempt to recover a prior

overpayment.[1]  Two counts remain pending.  The parties have filed cross-

motions for summary judgment.  For the reasons set forth below, the

Motions are allowed in part and denied in part.

<u>BACKGROUND</u>

The relevant facts are largely undisputed.  Sottoriva is an employee of

the Department who is also a member of the United States Army Reserve.

He was called to active military duty from January 17, 2003, to August 17,

2004.[2]  It is undisputed that Sottoriva was overpaid by the Department

during his active military service.  The instant case arises out of the

Department's attempts to recoup the overpayment.

_____

[1]The Court notes that while the Complaint references Defendant Daniel Hines, the correct spelling of the Comptroller's name is Hynes.  For consistency, the Court will use the correct spelling throughout this Opinion.

[2]Sottoriva's Motion for Summary Judgment is accompanied by a Memorandum of Law in Support of Motion for Summary Judgment (Plaintiff's Memorandum). <u>Plaintiff's Motion for Summary Judgment</u>, Attachment 1.  Plaintiff's Memorandum incorporates the exhibits attached to Plaintiff's Response to Motion for Summary Judgment (d/e 28) that was filed in response to a previous Motion for Summary Judgment by Defendant Claps.  As the Court previously noted, Plaintiff's Appendix of Documents including to these exhibits, Attachments Nos. 1 and 2 to d/e 28, does not contain internal sequential page numbers.  Many of the documents contain bates stamp numbers, and Plaintiff cites to these bates stamp numbers.  Unfortunately, the documents were not filed in bates stamp order, but rather in chronological order, making it difficult to efficiently locate documents by bates stamp number.  For clarity and consistency, the Court will generally cite to the parties' exhibits by the attachment and page numbers assigned by the electronic filing system; however, after identifying a deposition by its record attachment number, the Court will reference deposition testimony by the internal page numbers contained within the deposition.

At all relevant times, Sottoriva was a member of the American Federation of State, County, and Municipal Employees (AFSCME). Defendants assert that, under the applicable Collective Bargaining Agreements (CBAs), because Sottoriva was an AFSCME member, AFSCME was his "exclusive representative for his wages, hours, and conditions of employment and his sole and exclusive representative to bargain on matters pertaining to wages and salaries for his employment with the State of Illinois." Defendants' Memorandum of Law in Support of Motion for Summary Judgment (d/e 43) (Defendants' Memorandum), p. 3, Undisputed Material Fact No. 9. Sottoriva disputes this, asserting that the relevant sections of the CBAs do not define a collection of a debt as part of the agreements. Plaintiff's Response to Defendants' Motion for Summary Judgment (d/e 47) (Plaintiff's Response), p. 9-10.

Under State of Illinois Executive Order, any full-time employee of the State of Illinois who is a member of the Army Reserve and is mobilized to active duty in response to the September 11, 2001, terrorist attacks shall continue to receive his or her regular compensation as a State employee, plus any health insurance and other benefits, minus the amount of his or

her base pay for military activities.[3]  Following the issuance of Executive

Order 2003-6 and pursuant to it, a Memorandum of Agreement was

executed on February 20, 2003, between the Director of Central

Management Services and an authorized official of AFSCME Council 31

which stated that employees covered by the executive order "shall continue

in pay status and receive the amount of pay he/she would have received had

the employee continued active state employment, minus the amount of base

pay for military activities."  Complaint, Attachment 2, p. 3.  The

Memorandum of Agreement provided that activated employees "shall be

entitled to all employer-paid insurance benefits and to continue to purchase

optional benefits available to active employees until the leave ends."  Id.

According to Sottoriva, in the fall of 2002, he had reliable indications

that he was going to be called to active duty.  As a result, he began inquiring

about what would happen to his benefits while he was activated.  Response

(d/e 28), Attachment 6, Deposition of Joseph Sottoriva (Sottoriva Dep.), p.

---

[3]Plaintiff attached as exhibits to his Complaint both Illinois Executive Order 10(2001) and Illinois Executive Order 2003-6.  Complaint, Attachment 2, p. 1-2; Complaint, Attachment 6, p. 7.  Executive Order 10(2001) was signed by Governor George Ryan and became effective September 18, 2001.  Executive Order 2003-6 was issued by Governor Rod Blagojevich on February 7, 2003, and filed with the Illinois Secretary of State on February 11, 2003.  The Court notes that the relevant portions of Executive Order 10(2001) and Executive Order 2003-6 are identical.

17-20.   Sottoriva was specifically concerned about his family's health insurance coverage because, although his family would have been covered under Army health insurance during his active duty, the family physician was not listed as a provider in that coverage.  Id., p. 22-23.  Sottoriva indicated that he wished to continue his family health insurance coverage; however, he claims he told Department officials that he did not want to go into debt over his benefits.

According to Sottoriva, no one seemed to know the answers to his questions.  E-mails between Department officials in January 2003, indicated that they were discussing answers.   In a January 28, 2003, e-mail, Sottoriva's supervisor at the Department, James Bormann, wrote as follows:

> Since [Joe's] Army salary is significantly higher than his DHR salary, there is no difference for him to receive.  It is my understanding from Rene that his insurance will continue and that CMS will direct bill him for his portion of the premium. . . . It is also my understanding that his other benefits (sick, vacation, PB, etc.) continue to accrue.

> With this situation being very different than what we usually face, I don't know what it means as for his staying on or being removed from the payroll system.

Defendants' Memorandum, Attachment 4, p. 3, Ex. 2.   There is no indication whether this information was transmitted to Sottoriva.  It is clear

from the record that CMS did not directly bill Sottoriva for insurance as Bormann expected.  It is also clear that Sottoriva remained on the payroll system during his active duty.

Sottoriva's state pay was directly deposited into his bank account, and he was issued monthly statements notifying him of the deposits.  Sottoriva's military pay was directly deposited into the same bank account.  During the first three months after he was activated, Sottoriva received his full state pay from the Department.[4]  <u>Sottoriva Dep.</u>, p. 21.  Sottoriva assumed that this was not correct.  <u>Id</u>.  Sottoriva understands that, while on active duty, he was entitled to the greater of his military pay or his state pay.  Sottoriva concedes that, in absolute terms, his military pay exceeds his state pay.  <u>Id.</u>, p. 135.  The parties agree that Sottoriva was overpaid by the Department while on active duty.  The amount of the overpayment, however, is contested.

As early as April 4, 2003, Department personnel began calculating the difference between Sottoriva's state and military pay internally.  <u>Response (d/e 28)</u>, Attachment 1, p. 6-35.  On September 15, 2003, Michelle

_____

[4]Although the record is not clear on this issue, it appears that Sottoriva received his full pay for the following pay periods: 1/16-1/31/03, 2/1-2/15/03, 2/16-2/28/03, and 3/1-3/15/03.  <u>Motion to Amend (d/e 45)</u>, Attachment 1, Ex. 8, p. 2.

Dirksen, an employee of the Department, sent Sottoriva a memorandum containing an example of how the Department figured the pay difference each pay period.   Defendants' Memorandum, Attachment 5, p. 2-3. According to the September 15, 2003, memorandum, the comparison was made after calculating daily pay rates for the military versus the state pay. It appears from the record that this was done to account for the fact that Sottoriva's state pay was earned for five working days a week, while his military service did not recognize weekends or holidays.  Thus, Sottoriva's military pay for a given period was earned over more working days than his state pay.

While he was on active duty, amounts were deducted from Sottoriva's state pay to cover insurance benefits, deferred compensation, and taxes.[5]  In pay periods when Sottoriva's military pay exceeded his state pay, he was required to give back his entire state pay for the period to the Department. However, because the deductions had been applied, Sottoriva's remaining net pay for these periods was insufficient to meet his repayment obligation and, as a result, he acquired a deficit.  For pay periods in which his state pay

---

[5]According to the record the following deductions were applied: "Fica, Medl, St tax, Fed Tax, hlthIns. $79.75, dntl $7.50, def. Comp. $60, Union $16.75."  Response (d/e 28), Attachment 2, p. 21.

exceeded his military pay, Sottoriva was required to return the amount of his military pay.  It appears from the record that, because of the deductions that were applied, this generally also resulted in a deficit.

On April 23, 2004, Dirksen e-mailed Sottoriva in an attempt to respond to questions he had regarding the pay issue.  Dirksen informed Sottoriva that he had remained on the Department's payroll for the entire time he was on active duty, receiving "a full paycheck minus what [he] owe[d] back to the State each pay period . . . ."  Response (d/e 28), Attachment 1, p. 38.  Dirksen explained that, because Sottoriva received State benefits during the time he was on active duty, he never paid back the full amount he owed the State in each pay period, resulting in an increasing deficit.  Dirksen estimated that Sottoriva owed the State approximately $10,800.00 at that point.  On April 26, 2004, Dirksen sent another e-mail, indicating that if Sottoriva returned to work at the Department on July 1, 2004, he would, at that point, owe $17,982.47.  Response (d/e 28), Attachment 1, p. 40.  Dirksen suggested repayment at the rate of $200.00 a pay period for 89.9 pay periods, which equates to approximately four years.

Sottoriva returned to work at the Department on August 25, 2004.

On August 30, 2004, Sottoriva filed a union grievance concerning the overpayment issue.   Sottoriva created a three-page written narrative in support of his grievance.   <u>Response (d/e 28)</u>, Attachment 1, p. 41-43. Sottoriva's written statement claimed that Sottoriva had suffered tax losses in the amount of $4,428.00 as a result of the fact that the Department had reported his state pay as income on a W-2 form. <u>Id</u>., p. 42-43.  The record also contains an unexplained typed sheet which explains that Sottoriva was seeking the following three types of relief: (1) a written explanation by pay period showing how the Department calculated his pay and deductions, together with an accounting of amounts already collected and a summary of benefits due; (2) a waiver of overpayment based on administrative error; and (3) an amended W-2 for 2003 and an accurate W-2 for 2004. <u>Id</u>., p. 44.

The union initiated Sottoriva's grievance on September 1, 2004, asserting that Sottoriva detrimentally relied on the Department's representations that he was being paid the correct amount and asking that the Department be barred from seeking reimbursement of the alleged deficit, which it set at $17,982.47, in accordance with the April 26, 2004, notice to Sottoriva.  <u>Response (d/e 28)</u>, Attachment 1, p. 45-46.  It was

agreed to start Sottoriva's grievance at the third level grievance stage.  On
May 23, 2005, a pre-arbitration meeting was held between union and
management representatives on Sottoriva's grievance.  Sottoriva could have
attended this meeting under the applicable CBA, but he did not.  According
to Sottoriva, he did not know about the meeting.  Sottoriva concedes that,
on May 23, 2005, the union and management "resolved the grievance prior
to arbitration by agreeing that Sottoriva needed to repay the overpayment
to the State of Illinois and needed to agree to a payment plan with the
Illinois Department of Human Rights by July 1, 2005."  <u>Defendants'</u>
<u>Memorandum</u>, p. 8, Undisputed Material Fact No. 41; <u>Plaintiff's Response</u>,
p. 6.  The parties to the grievance executed a document titled Pre-Arb
Grievance Resolution, which states in substantive part as follows:
"COMMENT: Resolved: The grievant and the agency shall work out a re-
payment plan for the overpayment by July 1, 2005, w/o P & P."
<u>Defendant's Memorandum</u>, Attachment 5, p. 12.

In June 2005, in preparation for the creation of the payment plan,
Sottoriva's union representative, Nancy Kavanaugh, contacted the
Department requesting documentation relating to the formula used to
determine Sottoriva's military pay, the amount Sottoriva was paid, and

what he should have been paid, as well as an accounting of what Sottoriva

had already repaid.  Response (d/e 28), Attachment 1, p. 48.  A meeting was

set on the payment plan issue for September 1, 2005.  By letter dated

August 24, 2005, Sottoriva, through counsel, indicated to the Department

that he believed the amount of principal that was to be repaid needed to be

calculated or that a hearing should be held to determine the amount.  The

Department's Chief Legal Counsel Ray Luna responded by letter dated

August 26, 2005, stating that the amount of overpayment and information

regarding the manner in which it was calculated had been forwarded to

Sottoriva's union.  The letter further expressed Luna's belief that the union

had agreed to the overpayment amount.  Luna suggested that counsel

contact Sottoriva's union representative to obtain the information.

Response (d/e 28), Attachment 1, p. 52.

The Chief Fiscal Officer of the Department, Lynne Turner, prepared

a wage deduction repayment plan for Sottoriva, dated August 30, 2005.

Response (d/e 28), Attachment 1, p. 53.  The repayment plan set out the

amount owing to the State as $24,105.03.[6]  The repayment plan set out

---

[6]The Court notes that Defendants now contend that the final calculation revealed
that Sottoriva owed the Department $23,988.00 at this point.

four possible deduction options as follows: Option 1 – "A voluntary lump sum amount from the employee, followed by monthly payroll deductions"; Option 2 – "Voluntary payroll deduction 24 months @ 1,000 month (estimate)"; Option 3 – "Voluntary payroll deduction 36 months @ 669 per month (estimate)"; and Option 4 – "Involuntary withholding per the Comptroller's office, which will withhold 15%-25% of disposable income from wages, and any retirement, pension, state income taxes or travel reimbursement payments." Id.

On September 1, 2005, a meeting was held that was attended by Department Chief Counsel Luna, Department Chief Financial Officer Turner, union representative Nancy Kavanaugh, Sottoriva, and his attorney Carl Draper. At the meeting, Sottoriva was presented with the repayment plan that Turner had created. According to the repayment plan document, the pre-arbitration resolution authorized the Department to begin a repayment plan on July 1, 2005. Draper informed the Department personnel that Sottoriva disputed the amount that the Department claimed he owed. During the meeting, Sottoriva requested documentation supporting the calculation of the Department's claim of overpayment; however, none was provided. Subsequent to the September 1, 2005,

meeting, copies of Sottoriva's pay records were provided to Nancy Kavanaugh on September 6, 2005.  Motion to Amend (d/e 45), Attachment 1, Ex. 8.

On September 6, 2005, Draper wrote a letter to Luna on Sottoriva's behalf, asserting that it was unfair for the Department to expect Sottoriva to enter into a payment agreement before he was able to confirm the amount due.  Response (d/e 28), Attachment 2, p. 19-20.  Luna responded, by letter dated September 13, 2005.   Luna's letter stated that "the Department is in no position to compromise, settle or negotiate the amount owed by Joe Sottoriva."  Response (d/e 28), Attachment 2, p. 22.  According to the letter, "[b]ecause Joe did not take voluntary payroll deduction Option 1, 2, or 3, which was [sic] presented at our September 1, 2005, meeting, Option 4 (involuntary withholding) will be exercised by the Department." Id.

On September 15, 2005, Claps submitted an Involuntary Withholding Request to Comptroller Hynes.  Response (d/e 28), Attachment 2, p. 23. The withholding request sets forth an original claim amount of $24,105.03. Under a section entitled "Procedural Requirements," the request reads as follows: "Notification Type 03; Type of Hearing Offered 02; Statement of

Outcome 02; Date of Final Determination of Debt 8/30/05." Id.

On September 26, 2005, the Office of the Comptroller Collections Unit sent Sottoriva a notice regarding payment withholding for the Department of Human Rights.  Response (d/e 28), Attachment 2, p. 24. The notice stated that the Department had advised the Comptroller that Sottoriva owed money for salary overpayment.  Id.  The notice informed Sottoriva that, as a result, the Comptroller was withholding $435.38 from Sottoriva's payment of $1,575.59.  Id.  The notice continued as follows:

> If you have already contacted the claiming agency and still do not agree with the claim, you may file a protest by writing the Office of the Comptroller; . . . .  The Protest should contain a letter describing your reasons for protest and any documents or receipts that support your position. . . . If you do not file a written protest within 30 days from the date of this Notice, the withheld amount will be sent to Human Rights Dept as payment on the claim.

Id.  There was no indication in the Notice as to the total amount that the Department claimed Sottoriva owed.

Sottoriva, through counsel, submitted a written protest.  Response (d/e 28), Attachment 2, p. 25-28.  The Comptroller then asked the Department to provide documentation supporting its claim.  The Department sent a letter, dated December 2, 2005, with accompanying documents, denying the

14

allegations of the protest.  Response (d/e 28), Attachment 2, p. 30-42.
Based on the Department's submission, the Collections Unit informed
Sottoriva, by letter dated December 14, 2005, that the decision was to
forward the money that had been withheld to the Department.  Response
(d/e 28), Attachment 2, p. 43.  The letter directed that should Sottoriva
wish to dispute the decision, he should contact the Department.  Id.
Sottoriva, through counsel, did so, by letter dated December 15, 2005.
Response (d/e 28), Attachment 2, p. 44.  Sottoriva's letter characterized
both the Department's explanation and its calculations as "inaccurate" and
stated that he was requesting a hearing on the matter.  Id.  Luna responded
in a brief letter, dated December 22, 2005, that the Department "has no
further comment."  Response (d/e 28), Attachment 2, p. 45.

Sottoriva then continued to protest the withholding with the Office
of the Comptroller.  By letter dated February 17, 2006, the Comptroller's
Chief Counsel Whitney Rosen informed Luna that the Office of the
Comptroller was "concerned about the adequacy of the Department's
proceedings held to establish the amount of debt owed by Mr. Sottoriva."
Response (d/e 28), Attachment 2, p. 49.  Given that concern, Rosen
informed Luna that the Comptroller was removing the Department's claim

from the offset system.  Rosen stated, "This Office will reestablish the claim upon the Department's demonstration that due process and an opportunity to be heard was provided to the debtor in establishment of the amount of the claim."  Id.  The Comptroller stopped processing the involuntary withholding on or about February 21, 2006.  It is undisputed that, on February 22, 2006, the Comptroller paid Sottoriva $1,747.32.  Defendants' Memorandum, p. 11, Undisputed Material Fact No. 62; Plaintiff's Response, p. 8-9.  It is also undisputed that the Comptroller withheld $2,883.96 between September 26, 2005, and December 9, 2005.  Defendants' Memorandum, p. 10, Undisputed Material Fact No. 57; Plaintiff's Response, p. 8.

By letter dated March 14, 2006, Luna asked Rosen to vacate her decision and reinstate the Department's claim.   Response (d/e 28), Attachment 2, p. 53-59.  On March 27, 2006, Luna sent an e-mail to Lynne Turner, with a copy to Claps, as follows:

> I just spoke w/the Chief Counsel, Ofc of the Comptroller.
> She is saying there may be another way of getting the money from Joe instead of Offset; in other words, instead of going thru the Comptroller.
> Do you know of another way?
> Thanks.

Response (d/e 28), Attachment 2, p. 60.  Rosen sent a letter to Luna, dated

April 7, 2006, which stated in substantive part as follows:

> This letter is in response to your correspondence dated March
> 14, 2006.   I have reviewed the documentation that you
> provided.   I also further consulted with the Office of the
> Attorney General.  As we discussed on the telephone, this Office
> remains concerned that the Department has not made a final
> administrative determination of the amount of Mr. Sottorriva's
> [sic] debt, including adequate opportunity to establish the debt
> and notice of appeal rights.
>
> You indicated concern with the Department's capacity to
> provide an appropriate hearing in this matter.  Perhaps the
> Department could pursue additional proceedings under the
> collective bargaining agreement as a forum to adequately
> establish the amount of Mr. Sottoriva's debt.

Response (d/e 28), Attachment 2, p. 62.

At some point, the Department decided to recoup its money from

Sottoriva internally.  Response (d/e 28), Attachment 3, Deposition of Lynne

Marie Turner (Turner Dep.), p. 105-09.   The Department did this by

subtracting the amount that had been withheld by the Comptroller,

$438.00, from Sottoriva's pay rate before certifying his pay to the

Comptroller for payroll.   Id.  On May 2, 2006, at 3:10 p.m., Turner

informed Sottoriva of this withholding in an e-mail that states as follows:

"your new payroll withholding will begin with the 5.14.06 paycheck in the

amount of $438.00 per check.  This amount is equivalent to the amount the Comptroller withheld.  The withholding will continue until the debt is paid in full."  <u>Response (d/e 28)</u>, Attachment 2, p. 63.  At 3:32 p.m. that same day, Bobbie Wanzo, a deputy director with the Department, sent an e-mail to Turner, with copies to Claps and Luna, which stated as follows:

> Lynne,
>
> Thanks for the information.  I am sure that Joe will discuss this with his attorney but, again, I would like to remind you that any communication or discussion that we have on this issue should be with Joe and the union and not with Joe's attorney.  This is the result of the union grievance.  The union represents him on this issue not the attorney.  Thanks.

<u>Id</u>.  At 4:00 p.m. on that same day, Wanzo sent another e-mail to Turner that was copied to Claps and Luna that stated "Just thinking.  If we are contacted by the Attorney again, I think we should have a quick meeting just to make sure that we are all on the same page and that Rocco is comfortable with our position.  Thanks."  <u>Response (d/e 28)</u>, Attachment 2, p. 64.

On May 14, 2006, the Department issued Sottoriva a paycheck at a base pay of $1,867.50, despite the fact that his scheduled base pay was $2,305.05.  According to Turner, she certified the payroll that contained

18

this lower pay amount for Sottoriva by signing a computerized payroll certification containing the lower amount, which allowed the Department to bypass the Comptroller's system.   <u>Turner Dep.</u>, p. 152-54.   It is undisputed that the Comptroller has no procedure for dealing with any protest by a state employee in the event that an employee claims that he has been paid the wrong base pay on a paycheck.   <u>Plaintiff's Memorandum</u>, p. 16, Undisputed Material Fact No. 47; <u>Defendants' Response</u>, p. 4.

Sottoriva filed the instant Complaint on June 7, 2006, together with a Motion for Preliminary Injunction (d/e 2).  The Motion for Preliminary Injunction was denied as moot after the parties entered into a Joint Stipulation (d/e 12) providing for the cessation of withholding of any amounts from Sottoriva's paycheck in repayment of the disputed debt until final resolution of the instant case.   <u>Text Order, dated July 11, 2006</u>. Defendant Hynes filed a Motion to Dismiss (d/e 14) pursuant to Federal Rule of Civil Procedure 12(b)(6), which this Court denied in an Opinion (d/e 23) dated December 18, 2006.  Defendant Claps filed a Motion for Summary Judgment on November 8, 2006.  By Opinion (d/e 24) dated December 21, 2006, this Court continued Plaintiff's obligation to respond to Claps' Motion for Summary Judgment to allow Plaintiff to conduct

discovery pursuant to Fed. R. Civ. P. 56(f).  After Claps' summary judgment motion was fully briefed, this Court allowed Claps' request for summary judgment in part, granting summary judgment in favor of Claps on Sottoriva's Illinois State Finance Act claim, 30 ILCS 105/1, et seq., (Count III), in an Opinion (d/e 37) dated July 10, 2007.  The Court denied the Motion in all other respects.

Thus, two counts remain against Defendant Claps, a request for an injunction prohibiting the withholding of any wages or sums of money due him without due process of law (Count I) and a due process claim for money damages (Count II).  Hynes is named as a Defendant only in Count I.  The parties have filed cross-motions for summary judgment.

<u>ANALYSIS</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  <u>Fed. R. Civ. P.</u> 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party has the initial burden of

demonstrating the absence of a genuine issue of material fact and that judgment as a matter of law is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). When a properly supported motion for summary judgment has been made, the party opposing summary judgment may not merely rest on the pleadings but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "A party must present more than mere speculation or conjecture to defeat a summary judgment motion." Liu v. T & H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999). The Court must consider the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. See Anderson, 477 U.S. at 255.

The Due Process Clause of the Fourteenth Amendment forbids a state from depriving any person of life, liberty, or property without due process of law. U.S. CONST. Amend. XIV, § 1. Sottoriva brings a procedural due process claim. He claims that his due process rights were violated: (1) on September 15, 2005, when Claps submitted the involuntary withholding request to Comptroller Hynes and (2) in May 2006, when the Department certified Sottoriva's pay at a level below his actual salary in an attempt to collect the debt internally. The requirement of "[p]rocedural due process

imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." Id. at 333.

The undisputed facts show that, through the offset procedures and again beginning in May 2006, the Department withheld a portion of Sottoriva's current wages in an attempt to recover the prior amount owed. Clearly, Sottoriva has a property interest in his current wages. Sniadach v. Family Finance Corp., 395 U.S. 337, 340 (1969); see also Toney v. Burris, 881 F.2d 450, 453-54 (7th Cir. 1989); Toney v. Burris, 699 F.Supp. 687, 690-91 (N.D. Ill. 1988) ("when the state, through its procedures, withholds wages of its employees to pay their personal unpaid debts and delinquent obligations, it is engaged in a taking that must be done in a manner that comports with the fairness concept of 'due process of law'"). Sottoriva is suing Claps in his official capacity for matters concerning declaratory and injunctive relief and in his individual capacity for matters involving compensatory damages. Complaint, ¶ 2. Hynes is being sued in his official

capacity for injunctive relief.  Id., ¶ 3.

Defendants assert that the union grievance procedures provided Sottoriva with notice and a meaningful opportunity to be heard, thus satisfying due process.  Sottoriva contends that it did not.  As the Court noted in its ruling on Defendant Claps' prior summary judgment motion, a grievance procedure under a collective bargaining agreement can, in some circumstances, satisfy due process.  See, e.g., Hudson v. City of Chicago, 374 F.3d 554, 563 (7th Cir. 2004); Buttitta v. City of Chicago, 9 F.3d 1198 (7th Cir. 1993).  The parties agree that the applicable CBA provides for a four-step grievance process prior to arbitration as follows: step one, determination by immediate supervisor; step two, determination by intermediate supervisor; step three, determination by head of agency; and step four, pre-arbitration staff meeting to attempt resolution between CMS staff and union staff.  Defendants' Memorandum, p. 4, Undisputed Material Fact No. 13; Plaintiff's Response, p. 3.  The parties further agree that, in the event the grievance is not resolved, the union can advance the issue to arbitration.  Defendants' Memorandum, p. 4, Undisputed Material Fact No. 15; Plaintiff's Response, p. 3.  Defendants have provided the Court with a copy of the relevant CBA, which sets out the process for arbitration.

See Defendants' Memorandum, Attachment 3, p. 7.  Given this evidence, it is clear that the grievance process set out in the applicable CBA comports with due process.

Defendants assert that Sottoriva's grievance challenged only the fact of repayment and not the amount.  Sottoriva contends that it encompassed both issues, but resolved only his liability to repay some amount to the Department.  As Defendants correctly note, in Hudson, the Seventh Circuit held that the existence of a grievance procedure may be sufficient to satisfy due process, even if the employee fails to avail himself of the available protections.  Hudson, 374 F.3d at 563-64.  Thus, if Sottoriva could have challenged the amount of the repayment through the grievance process but did not, Defendants would be entitled to summary judgment.  Similarly, if Sottoriva could have grieved the May 2006, pay certification, but did not, due process would nevertheless be satisfied.

Sottoriva did not grieve the amount of the overpayment, only the fact of repayment.  This is supported by the fact that the grievance does not expressly challenge the amount, and the Pre-Arb Grievance Resolution states that Sottoriva's grievance is resolved.  In addition, the grievance indicates that the amount of $17,982.47, to be repaid, had been told to Sottoriva.

Clearly Sottoriva could have raised an issue in the grievance that the $17,982.47 amount was wrong, but he did not. The grievance resolution document indicates that the grievance was resolved, and only a repayment plan was left to be completed. It states as follows: "COMMENT: Resolved: The grievant and the agency shall work out a re-payment plan for the overpayment by July 1, 2005, w/o P & P." <u>Defendant's Memorandum</u>, Attachment 5, p. 12. Thus, Sottoriva received due process through the union grievance proceeding in the determination that as of July 1, 2005, Sottoriva needed to repay $17,982.47.[7]

However, the repayment plan of August 30, 2005, prepared by the Department indicated the amount owed to the State was $24,105.03. Furthermore, the Court notes that the involuntary withholding request that Claps submitted on September 15, 2005, indicates that the debt was finally determined on August 30, 2005, and does not mention the May 23, 2005, date of the grievance resolution. <u>Response (d/e 28)</u>, Attachment 2, p. 23.

---

[7]The Court recognizes that it previously ruled that a factual issue existed as to the scope of the grievance process and resolution. The Court now, however, determines that there was due process with respect to the determination that $17,982.47 was owed as of July 1, 2005, but that there was no due process with respect to the determination that by August 30, 2005, the amount had grown to $24,105.03. When the Court ruled previously, there was no evidence presented as to what the grievance process entailed. Now that that evidence has been provided, the Court can determine that it satisfied due process, at least to the point that the $17,982.47 amount was determined.

Finally, the Comptroller's office indicated concern about the adequacy of proceedings held to establish the amount of debt owed by Mr. Sottoriva at the time it refused to continue the requested offset.  Response (d/e 28), Attachment 2, p. 49.  Clearly, Sottoriva received no due process with respect to the decision, apparently reached between July 1 – August 30, 2005, that he owed $24,105.03, rather than $17,982.47.

Defendant Claps asserts that even if Sottoriva's due process rights were violated, he is entitled to qualified immunity from Sottoriva's suit for money damages.   Qualified immunity shields "[g]overnmental actors performing discretionary functions" from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sallenger v. Oakes, 473 F.3d 731, 739 (7th Cir. 2007).  Thus, qualified immunity would apply, at most, to the claims against Claps in his individual capacity.  To overcome qualified immunity, Sottoriva must demonstrate: (1) a violation of a constitutional right (2) that is clearly established at the time of the alleged violation, so that a reasonable public official would have known that his conduct was unlawful.  Green v. Butler, 420 F.3d 689, 700 (7th Cir. 2005); see also Saucier v. Katz, 533 U.S. 194, 200-02 (2001).  As

discussed above, Sottoriva has satisfied the first prong by demonstrating the violation of his right to due process.  Therefore, the Court must determine whether Sottoriva has demonstrated that: (1) in September 2005, a reasonable official would have known that the request for an offset violated due process, and (2) in May 2006, a reasonable official would have known that certifying a lesser base pay for Sottoriva, in order to circumvent the Comptroller's regulations, would be unlawful.

To meet his burden, Sottoriva "may point to closely analogous cases demonstrating that the conduct is unlawful or demonstrate that the violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution."  Green, 420 F.3d at 700 (internal quotations and citation omitted).  As he did in response to Claps' prior Motion for Summary Judgment, Sottoriva relies on the series of Seventh Circuit and Northern District of Illinois cases in the matter of Toney v. Burris.  See 881 F.2d 450; 829 F.2d 622 (7th Cir. 1987); 1990 WL 91451 (N.D. Ill June 25, 1990); 699 F.Supp. 687; 650 F.Supp 1227 (N.D. Ill. 1986).  The Court detailed the history of the Toney litigation in its prior Opinion and will not restate it here.  See Opinion (d/e 37), p. 30-34.  As set forth above, Sottoriva received no due process with respect to the decision

that he owed $24,105.03 rather than $17,982.47. Despite this, Claps certified an offset request stating that the debt in the amount of $24,105.03 had been established on August 30, 2005. It is undisputed that, after the Comptroller's Office rejected the proposed offset based on concerns about the adequacy of the notice and opportunity to be heard that had been afforded by the Department, the Department sought a way to circumvent the Comptroller's procedures. Viewing the evidence in the light most favorable to Sottoriva, Claps, without statutory or contractual authority, approved of the Department's plan to recoup the $24,105.03 by certifying a lower base pay for Sottoriva. Clearly, after the <u>Toney</u> litigation, a reasonable state official would have known that it was unconstitutional to request an offset for an amount that had not been resolved in accordance with due process and later to certify the lesser pay amount for Sottoriva in order to collect the debt without regard to the Comptroller's procedural protections. Claps is not entitled to qualified immunity.

As a third argument, Defendant Claps asserts that he is entitled to summary judgment on Sottoriva's claim for compensatory damages because Sottoriva did not suffer a compensable injury. At the outset, the Court notes that proof of compensable injury is not an essential element of

Sottoriva's case. The Seventh Circuit has recognized that "a person whose rights under the due process clause have been violated receives nominal damages if he cannot show out-of-pocket loss or other concrete injury." Gates v. Towery, 430 F.3d 429, 431 (7th Cir. 2005). As Claps correctly notes, in order to recover compensatory damages for a due process violation, Sottoriva must demonstrate that the damages were caused by the denial of due process. Alston v. King, 231 F.3d 383, 386 (7th Cir. 2000). However, viewing the record in the light most favorable to Sottoriva, the Court cannot say that a reasonable jury would not award Sottoriva any compensatory damages. Claps fails to identify undisputed evidence to show that, had process been offered on the amount of the overpayment, the result would have set the amount at the number claimed by the Department. Claps is not entitled to summary judgment on the issue of compensatory damages. This decision, however, does not bar Claps from raising the issue of causation in a motion in limine or at trial.

Finally, the Court must address Hynes' argument that he is entitled to summary judgment because, at the time the suit was filed, there was no ongoing violation of Sottoriva's rights. The Eleventh Amendment generally bars actions in federal court against state officials acting in their official

29

capacities. Well-recognized exceptions to this general rule exist, however, including the Ex parte Young doctrine. See Ex parte Young, 209 U.S. 123 (1908). Under the Ex parte Young doctrine, a plaintiff may file suit against state officials seeking prospective equitable relief to rectify ongoing violations of federal law. Id. at 159-60. Hynes asserts that, at the time Sottoriva filed suit, the Office of the Comptroller had ceased withholding funds from Sottoriva's checks after determining that further proceedings might be necessary. Thus, any due process violation was not "ongoing." This argument ignores the fact that in May 2006, the Department began certifying Sottoriva's pay at a level below his actual salary and the Comptroller issued checks accordingly. It is undisputed that the Comptroller has no procedures in place to deal with a situation in which an employee claims that he has been paid the wrong base pay on a paycheck. Viewing the evidence in the light most favorable to Sottoriva, until the parties entered into the Joint Stipulation providing for the cessation of withholding of any amounts from Sottoriva's paycheck in repayment of the disputed debt pending final resolution of the instant case, the second alleged due process violation was ongoing. Hynes is not entitled to Eleventh Amendment immunity.

Turning to Sottoriva's request for summary judgment in his favor on

Count I, the Seventh Circuit has instructed as follows:

> Where a permanent injunction has been requested at summary
> judgment, we must determine whether the plaintiff has shown:
> (1) success, as opposed to a likelihood of success, on the merits;
> (2) irreparable harm; (3) that the benefits of granting the
> injunction outweigh the injury to the defendant; and, (4) that
> the public interest will not be harmed by the relief requested.

Collins v. Hamilton, 349 F.3d 371, 374 (7th Cir. 2003). As previously

noted, Sottoriva received due process with respect to the decision that he

owed $17,982.47 as of July 1, 2005. He has no right to an injunction

precluding withholding, at least as to that amount.

THEREFORE, Sottoriva's request for summary judgment on Count

I (d/e 44) is allowed in part and denied in part. It is allowed to preclude

withholding of any amount in excess of $17,982.47 without a further due

process hearing for Sottoriva. It is otherwise denied. Defendants' Motion

for Summary Judgment on Count I (d/e 42) is ALLOWED to the extent

that Defendants will not be enjoined from withholding money due Sottoriva

up to an amount of $17,982.47; in all other respects the Motion is denied.

Also, for the reasons set forth above, Defendants' Motion for

Summary Judgment (d/e 42) on Count II, and Plaintiff's Motion for

Summary Judgment (d/e 44) on Count II are ALLOWED in part.  With respect to the determination that Sottoriva owed $24,105.03 rather than $17,982.47, partial summary judgment as to liability is entered in favor of Sottoriva and against Defendant Claps in his individual capacity.  With respect to the determination that $17,982.47 was owed as of July 1, 2005, summary judgment is granted to Defendants.  The case will proceed to trial on damages for the due process violation in setting the amount owed at $24,105.03, rather than $17,982.47, and for the related actions in withholding from Sottoriva's salary and certifying lesser pay amounts.

IT IS THEREFORE SO ORDERED.

ENTER:   March 26, 2008

   FOR THE COURT:

      s/  Jeanne E. Scott
      JEANNE E. SCOTT
     UNITED STATES DISTRICT JUDGE